FILED

2015 Jul-06  PM 04:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

| | |
|---|---|
| **BRANDON WILLIAMS, a minor suing** ] <br> **by and through his legal custodian,** ] <br> **guardian, and next friend, BLAINE** ] <br> **BREASEALE,** ] <br> ] <br>     **Plaintiff,** ] <br> ] <br> **v.** ] <br> ] <br> **THE COLEMAN COMPANY, INC.,** ] <br> **d/b/a SEVYLOR, POLYAMA** ] <br> **PLASTIC INDUSTRIAL LTD., and** ] <br> **ZHONGSHAN PLEASURE TIME** ] <br> **PLASTIC INDUSTRIAL LTD.,** ] <br> ] <br>     **Defendant.** ] | **Case No.: 4:11-cv-02384-KOB** |

<u>**MEMORANDUM OPINION**</u>

In 2009, a boating accident severed six-year-old Plaintiff Brandon Williams' foot.  The accident involved a Monster Mania tube, a towable boating tube.  Following the accident, Williams, through his legal custodian, brought suit against the Coleman Company Inc., Polyama Plastic Industrial Ltd., and Zhongshan Pleasure Time Plastic Industrial Ltd.  In his complaint, Williams asserts product liability claims against the Defendants for strict liability (Count I), negligence,  (Count II), breach of warranty of merchantability (Count III), and breach of implied warranty of fitness for a particular purpose (Count IV).[1]

This matter comes before the court on the Coleman Company's "Motion for Summary Judgment" (doc. 85), in which Polyama and Zhongshan join (doc. 88), and on the Defendants'

---

[1] The court has both diversity and admiralty jurisdiction over Williams' claims.

1

joint "Motion to Strike Plaintiff's Expert John C. Frost" (doc. 87). Also before the court is Polyama and Zhongshan's separate "Motion for Summary Judgment Specific to Count II." (Doc. 89). For the reasons discussed below, this court will **DENY** all of the Defendants' motions.

### I.  Standard of Review

Summary judgment is an integral part of the Federal Rules of Civil Procedure. Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 254 (1986); *see Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (internal quotation marks and citations omitted). This is because "the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (citation and internal quotation marks omitted). However, if the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

2

After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.

## II.  Factual Background

**The Production of the Monster Mania Tube**

The Monster Mania tube is an inflatable donut-shaped tube designed and distributed by the Coleman Company for recreational tubing.  Although the Coleman Company designed the Monster Mania tube, it does not manufacture it.  Instead, the Coleman Company contracted with Polyama for production of the Monster Mania tube and provided Polyama with the design specifications for the tube as well as the tube's warnings.  Polyama then filled the Coleman Company's order by contracting with Zhongshan to manufacture the Monster Mania tube. Zhongshan manufactured the tubes using the Coleman Company's specifications and attached the warnings designed by the Coleman Company.  The tubes then passed from Zhongshan to Polyama to the Coleman Company before ultimately being sold to consumers.

**The Accident**

On the 4th of July, 2009, six-year-old Brandon Williams went boating with his family on Lake Guntersville.  Barry Bush, the owner of the boat, had purchased a Monster Mania tube the day before and intended to treat his family and friends to a day tubing on the lake.  After inflating the tube, Mr. Bush decided to tow the tube to the middle of the lake before having any rider climb aboard.  Mr. Bush attached one end of a sixty-foot tow line to the plastic cleat on the front of the tube and the other end of the rope to the tow cleat on the back of the boat.  Because he did not want the tube trailing sixty feet behind his boat as he navigated through the boat traffic, Mr.

Bush pulled the tube within a few feet of the back of the boat and tied the tow rope to a wooden railing, coiling the excess rope on the floor.  After tying the rope off, Mr. Bush piloted the boat toward the center of the lake, pulling the Monster Mania a few feet off the back of the boat.

As the boat picked up speed and began to plane, the Monster Mania pitched in the air, landing upside-down in the boat's wake.  When the top of the tube contacted the water, the Monster Mania broke free from where it had been tied to the wooden rail, and the tow rope, still attached to the tube, began to quickly unravel as the boat sped away.  Williams had been riding in the back of the boat and attempted to avoid the rope as it quickly unraveled.  Unfortunately, the rope became tangled around Williams' leg and  jerked Williams into the air, pulling him toward the boat's rear railing.  As it became taut, the rope pulled Williams into the gap between the railing and the boat, severing his foot in the process.  Williams' family rushed him to the hospital, but his foot could not be saved.  A later inspection of the boat revealed that a steel fastener that attached the wooden railing to the boat had been bent to the point of failure, partially detaching the wooden railing from the boat.

**The Investigation**

Following the accident, Williams hired Safety Engineer John C. Frost to evaluate the events leading up to his accident to determine how the accident could have been avoided.  Mr. Frost first inspected the boat's condition and reviewed the accounts of the accident from passengers who had been on the boat.  After doing so, Mr. Frost developed a hypothesis that the Monster Mania tube created significantly greater drag forces when towed in an inverted position. The additional drag on the rope wrenched one end of the wooden railing from the boat, allowing the tow line to slip free.

4

Having developed a theory of the accident, Mr. Frost then set out to test whether his hypothesis was correct.  In his first test, Mr. Frost pulled a Monster Mania tube behind the boat at various speeds in both the correct and inverted positions.  During this initial test, Mr. Frost did not use any equipment and simply grasped the tow line to determine whether the drag increased when the tube was pulled in different positions and at different speeds.  Following his initial test, Mr. Frost concluded that the tube created more drag when towed in an inverted position.

Mr. Frost subsequently returned to the lake two additional times to perform further testing.  In each of the subsequent tests, Mr. Frost followed the same approach as the first test except that he incorporated a dynamometer into the tow line to measure the forces placed on the rope.  The dynamometers that Mr. Frost used on the tests connected to a handheld device that gave a live readout of the forces placed on the rope.  During the tests, Mr. Frost would watch the readout and wait until it settled into a range of numbers.  He would then record and average those numbers to calculate the average strain placed on the rope at each speed.  After conducting the tests, Mr. Frost included the averaged numbers in his expert report.

The result of Mr. Frost's testing confirmed his hypotheses.  In his report, Mr. Frost explains that the drag forces created by the Monster Mania when it flipped over on the day of the accident increased from approximately 40 pounds to more than 500 pounds, dramatically increasing the strain on the railing where the rope had been tied.  Mr. Frost believes that but for the increased strain on the rope, the railing would not have been wrenched free and the accident would not have occurred.

Mr. Frost's report identifies two major design defects of the Monster Mania tube.  First, Mr. Frost found that because of the location of the tube's tow handle—the strap sewn onto the

5

tube to which the tow line is attached—the tube would be pulled down into the water when inverted.  Mr. Frost found that if the tow handle had been attached to the centerline of the tube instead of to the bottom portion of the tube, the tube would have skimmed over the water when towed in an inverted position rather than causing the tube to "submarine."  Mr. Frost also found that the cover on the bottom of the tube created a strong vacuum when towed upside-down.

The second defect related to the tube's cover.  The Coleman Company designed the Monster Mania with a solid, non-permeable bottom and an open top.  The bottom cover has a one-way-flapper valve that allows for water to drain out of the tube.  In his report, Mr. Frost states that, when towed in an inverted position, the water rushing underneath the tube created a vacuum by sucking the air out of the cavity created by the donut-shaped tube.  The one-way flapper valve sealed the bottom of the tube, ensuring that the vacuum was not broken.  Mr. Frost stated that the vacuum effect created by the tube could have been eliminated if the flapper valve had been designed differently.

In addition to taking issue with the tube's design, Mr. Frost also concluded that the warnings on the tube were insufficient to alert consumers to the dangerous drag forces created by the tube when towed in an inverted position.  Mr. Frost noted that neither the tube's operator manual, the on-product warnings, nor the Monster Mania's packaging warned about the dangers of towing the tube without a rider or provided guidance on how to transport the tube safely on the boat.

Mr. Frost pointed out that similar tubes to the Monster Mania made by the Coleman Company's competitors contained the following warning language:

Do not pull a towable without a rider.  A towable is designed to have a rider in

order to balance the weight distribution of the product.

If the towable overturns, the boat/watercraft driver should not exceed 5 mph until the towable is upright again.

Extreme drag forces may also result if the rider(s) fall off

Death or serious injury can result from the submarine or anchor effect causing more extreme drag forces on the tow rope and/or tow point.  The tow rope might have too much stress and either break and snap back at the riders or other occupants of the boat.

(Doc. 93-4, at 21).  Mr. Frost opined that the accident would likely have been avoided if the tube had included adequate warnings.

Relying on Mr. Frost's report, Williams brought suit against the Coleman Company, Polyama and Zhongshan.  In the suit, Williams asserts that the Monster Mania was defectively designed and that it contained inadequate warnings.

## II.  Discussion

### A.   Defendants' joint motion to strike and motion for summary judgment

The Defendants' sole argument in support of their motion for summary judgment is that Williams cannot establish either the defect or causation elements of his product liability claims because Mr. Frost's expert report and testimony—Williams's only evidence on the causation and defect elements of his claims—should be excluded under Federal Rule of Evidence 702 and *Daubert v. Merrel Dow Pharm., Inc.*, 509 U.S. 579 (1993).  Because the Defendants' motion for summary judgment is entirely premised upon their argument that Mr. Frost's testimony and report are inadmissible, this court must first determine whether the Defendants' motion to exclude Mr. Frost's expert testimony is meritorious.  This court concludes that it is not.

In *Daubert*, the Supreme Court emphasized that the district court acts as a gatekeeper to

7

ensure that expert testimony is both relevant and reliable before it is admitted as evidence. 509

U.S. at 589.  The admissibility of expert testimony is governed by Federal Rule of Evidence 702,

which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Under Rule 702, the burden of establishing the admissibility of expert testimony is on the

party seeking to have the testimony admitted.  *See Rink v. Chminova, Inc.*, 400 F.3d 1286,

1291–92 (11th Cir. 2005).  In determining whether an expert's testimony or report may be

admitted, courts engage in a three-part inquiry into whether

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (internal citation omitted).

In the present case, the Defendants contend that Mr. Frost's testimony and report do not

satisfy the first two prongs of that test—that Mr. Frost is qualified and that his methodology is

reliable.

### 1.    *Mr. Frost's Qualifications*

In determining whether an expert witness is qualified to testify, a court must "examine the

credentials of the proposed expert in light of the subject matter of the proposed testimony." *Jack*

*v. Glaxo Wellcome, Inc.*, 239 F. Supp. 2d 1308, 1314–16 (N.D. Ga. 2002).  An expert may be qualified by virtue of his "knowledge, skills, experience, training, or education."  *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007).  Additionally, "[a]n expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand."  *Id.* (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)).

Here, Williams intends to have Mr. Frost testify that the Monster Mania tube is defectively designed because the tube creates excessive drag when towed in an inverted position, and that the tube's warnings were inadequate.  Having reviewed Mr. Frost's resume, report, deposition transcripts, and affidavit, this court concludes that Mr. Frost possesses sufficient education and experience to testify regarding the design of the tube, the drag forces created by the tube, and the adequacy of the tube's warnings.

Mr. Frost has a bachelors degree in electrical engineering from the University of Virginia and a masters degree in industrial engineering from Texas A & M.  After earning his masters degree, Mr. Frost worked as a Safety Engineer with the U.S. Army Missile Command, obtaining the rank of Chief of the Safety Office for the U.S. Army Aviation and Missile Command.  While working for the Army, Mr. Frost conducted testing to evaluate and calculate drag forces for numerous aviation and missile products.  Mr. Frost also served as a member of NASA's Aerospace Advisory Panel, where he provided advice on NASA's flight and ground safety programs.

In addition to his government work, Mr. Frost has evaluated the safety of over a thousand different product designs during his thirty-three years as a private sector Safety Engineer Consultant.  Over the course of his career, Mr. Frost has investigated hundreds of accidents to

determine the cause of the accident and make suggestions on how future accidents could be

avoided.  Although Mr. Frost has not previously worked with the design of towable boating

tubes, he has sufficient education and experience related to the safety of product designs to

qualify him as an expert on the design of the Monster Mania tube.

In addition to his extensive experience related to product design defects, Mr. Frost also

has experience related to the adequacy of product warnings.  As a safety engineer, Mr. Frost

received extensive training relating to the impact of human factors in the causation and

prevention of accidents.  While working for the U.S. Army, Mr. Frost was responsible for

reviewing and approving the warnings in Army Technical Manuals utilized by troops around the

world.  Mr. Frost has also previously testified as an expert in both state and federal court

regarding the adequacy of warnings in product liability cases.  Mr. Frost's credentials establish

that he is sufficiently qualified to testify as an expert regarding the sufficiency of the warnings on

the Monster Mania tube.

In sum, Mr. Frost's experiences and education establish that he is qualified to testify to

both the design of the tube as well as the adequacy of the tube's warnings.  Thus, Mr. Frost

satisfies the first prong of the *Daubert* test.

### 2.  *Mr. Frost's Methodology*

To fulfill its gatekeeper function under *Daubert*, a district court must ensure that an

expert witness's scientific opinions are the "product of reliable principles and methods."  *United*

*States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005).  In evaluating the reliability of an

expert's scientific opinion, a court must assess, to the extent practicable, "(1) whether the

expert's theory can be tested and has been tested; (2) whether the theory has been subjected to

10

peer review and publication; (3) the known or potential error of the particular scientific

technique; and (4) whether the technique is generally accepted in the scientific community."

*United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir 2004) (internal citation omitted).  These

factors, however, are not "a definitive checklist or test" that a district court must apply.

*Chapman v. Procter & Gamble Dist., LL*, 766 F.3d 1296, 1305 (11th Cir. 2014) (internal

quotation omitted).  Rather, the application of *Daubert* considerations is a case-specific inquiry

focused on "whether the evidence is genuinely scientific, as distinct from being unscientific

speculation by a genuine scientist."  *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316–17

(11th Cir. 1999).

     In the present case, the Defendants allege that Mr. Frost's methodology is flawed for

multiple reasons.  However, the Defendants' objections to Mr. Frost's methodology all go to the

weight of Mr. Frost's testimony, not its admissibility.

     The Defendants initially attack Mr. Frost's tests for failing to inflate the tubes to a

specific air pressure[2] and for conducting his tests with an "unidentified tow rope with unknown

characteristics."  Defendants hypothesize that both of these variables may have impacted the

results of Mr. Frost's tests.  However, even assuming that Mr. Frost failed to account for such

variables, such a lapse would go to the weight of Mr. Frost's testimony, not its admissibility.  *See*

*Bazemore v. Friday*, 478 U.S. 385, 400 (1986) ("Normally, failure to include variables will affect

the analysis' probativeness, not its admissibility.");  *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK*

---

[2] The Defendants' criticism of Mr. Frost's failure to inflate his tubes to a specific air pressure is
undercut by the fact that the Monster Mania packaging does not specify any particular air pressure to
which the tube should be inflated; further, one of the Defendants' own experts who conducted similar
tests of the Monster Mania tube, Kevin Breen, *also* failed to inflate the tube to a specific air pressure.

*Ltd.*, 326 F.3d 1222, 1245 (11th Cir. 2003) (stating that "in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility") (internal citation omitted).  The Defendants can sufficiently address both Mr. Frost's failure to inflate the Monster Mania tube to a specific pressure and his failure to consider the impact of the tow rope on his testing through rigorous cross-examination.

The Defendants' other criticism of Mr. Frost is that he purportedly used an inaccurate method for recording the readout of the dynamometer.  The Defendants point out that Mr. Frost did not use a computer program to record the number's expressed on the dynamometer but, instead, watched the dynamometer until it settled into a range of numbers and then averaged those numbers.  This approach, according to the Defendants, did not account for the peak and sustained forces created by the tube.  The Defendants contend that Mr. Frost's failure to include more data in his report prevents the tests from being duplicated and verified.

As an initial matter, although the Defendants contend that Mr. Frost's test cannot be reproduced and verified, Mr. Frost tested the drag forces created by the tube on two separate occasions and found similar results.  Further, the Defendants' expert Kevin Breen also conducted analogous tests of the Monster Mania tube and recorded drag forces comparable to those recorded by Mr. Frost.  Given that multiple experts have assessed the Monster Mania tube through similar tests and reached similar conclusions, the court fails to see in what way Mr. Frost's methodology is incapable of being reproduced.

The thrust of Defendants' criticism of Mr. Frost's method is not that his method is not scientifically valid but, instead, that he failed to record as much information as the Defendants'

experts recorded.  The Defendants point out that Mr. Frost's notes for each of his testing sessions ranged in length from four to six pages while the Defendants' experts used computer programs to digitally record the results of the test, producing over forty pages of notes.  The Defendants also criticize Mr. Frost for failing to record the lateral and longitudinal acceleration of the tube as well as the peak and sustained forces placed on the rope.  What Defendants fail to do, however, is explain how Mr. Frost's failure to record this additional information establishes that Mr. Frosts' methodology is unreliable.  The mere fact that the Defendants' experts recorded more information than Mr. Frost does not call into question the reliability of Mr. Frosts' method, and the Defendants can address any deficiency in Mr. Frost's recording method during cross-examination.  *See Quiet Tech. DC-8, Inc.*, 326 F.3d at 1345 (holding that the "identification of [] flaws in generally reliable scientific evidence is precisely the role of cross-examination.").

In sum, the Defendants' objections to Mr. Frost's testimony and report go to the weight of the evidence and may be sufficiently addressed through cross-examination.  Therefore, the Defendants' motion to exclude Mr. Frost's testimony and report is due to be denied.  Likewise, because Mr. Frost's testimony *is* admissible, the Defendants' joint motion for summary judgment is also due to be denied because genuine issues of material fact exist as to whether the Monster Mania tube is defective and whether that defect caused Williams' injuries.

**B.      Defendants Polyama and Zhongshan's Motion for Summary Judgment**

In their separate motion, Polyama and Zhongshan move for summary judgment on Williams's Count II claim for "Negligence and/or Wantonness."  In that claim, Williams alleges that Polyama and Zhongshan were negligent in connection with the design, testing, warnings, and manufacturing of the Monster Mania tube.  Polyama and Zhongshan contend that they are

entitled to summary judgment on Williams' negligence claim because they did not owe Williams a duty related to the design, testing, or warnings of the Monster Mania tube *and* that, although they do owe Williams a duty related to the manufacturing of the tube, Williams failed to establish a manufacturing defect.

To establish a negligence claim under maritime law, a plaintiff must establish that "(1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) the plaintiff suffered actual harm." *Caper v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012). Thus, a plaintiff's initial burden in proving a claim for negligence is establishing that the defendant owed the plaintiff a duty of care. *See Jennings v. BIC Corp.*, 181 F.3d 1250, 1257 (11th Cir. 1999).

Polyama and Zhongshan contend in their motion for summary judgment that they did not owe Williams a duty related to the design, testing, or warnings of the Monster Mania tube because they simply followed the specifications of buyer of the tube, the Coleman Company. In other words, Polyama and Zhongshan contend that because they did not design or develop the tube or its warnings, they could not have been negligent in relation to those aspects of the Monster Mania tube.

In response, Williams contends that Polyama and Zhongshan had a "non-delegable duty" under admiralty law "to manufacture a product which is reasonably safe for its intended purpose." (Doc. 92, at 3) (citing *Vaughn v. Marine Transp. Lines*, 723 F. Supp. 1126 (D. Md. 1989). In support of this proposition, Williams relies on *Vaughn*, in which the District Court held a manufacturer liable under maritime law for producing a product that was defectively

14

designed because it used asbestos insulation.  *See* 723 F.3d at 1130.  In explaining its decision,

the Court held that the manufacturer of the product, in that case a boiler, had a non-delegable

duty to make the product reasonably safe for its intended use.  *See id.* At 1130.  Williams

contends that the rule stated in *Vaughn* applies equally to the case at hand.

Williams, however, is mistaken because *Vaughn* is distinguishable from the present case

in one critical aspect; unlike either Polyama or Zhongshan, the manufacturer in *Vaughn* was not

only the manufacturer of the product but also played a role in the *design* of the product.  In

*Vaughn*, the Court specifically noted that the manufacturer "was in the position to decide what

materials to use to insulate its boilers."  *Id*. at 1129.  Thus, *Vaughn* does not stand for the

proposition that a manufacturer that follows the design specifications of the seller may be found

negligent in connection with the product's design.  Rather, *Vaughn* stands for the basic rule that a

manufacturer that designs a product may be found liable if the manufacturer's design is defective.

Indeed, the majority of courts addressing similar fact patters have declined to hold a

manufacturer liable for the defective design of a product when the manufacturer simply followed

the specifications of the buyer.  For example, in *Garrison v. Rohm & Haas Co.*, 492 F.2d 346 6th

Cir. 1974), the Sixth Circuit held that the manufacturer of a dolly could not be held liable for the

defective design of the dolly when the manufacturer followed the exact design and specifications

furnished by the buyer.  *Id.* at 347.  The court stated that to hold that manufacturer "liable for

defective design would amount to holding a non-designer liable for design defect.  Logic forbids

such a result."  *Id*. at 353.  Likewise, the First Circuit reached a similar conclusion, holding that a

manufacturer who simply produced a product to the specifications of the buyer was acting more

as an "independent contractor" than a manufacturer and had no duty related to the design of the

product.  *See Hatch v. Trail King Indus.*, *Inc.*, 656 F.3d 59, 67–68 (1st Cir. 2011).  Finally, in

*Rodgers v. Costa Crociere, S.P.A.*, 410 F' App'x 210, 212 (11th Cir. 2010), the Eleventh Circuit

affirmed a district court's grant of summary judgment on a negligent design claim in favor of a

cruise ship operator because the plaintiff had failed to present evidence that the operator played a

role in designing the relevant defective portion of the ship.

In sum, the great weight of common law principles, which apply in admiralty law, support

the proposition that a manufacturer does not have a duty related to the design of a product unless

that manufacturer played a role in designing that product.  Therefore, the mere fact that

Zhongshan and Polyama played a role in the production of the Monster Mania tube does not

establish that they owed Williams a duty related to the design of the tube or its warnings.

Instead, Polyama and Zhongshan would owe a duty to Williams related to the design of the

Monster Mania tube only if they actually played a role in its design.  However, as will be

discussed below, sufficient evidence exists in the present case to create a genuine issue of fact as

to whether Polyama and Zhongshan did play a role in the design of the Monster Mania tube.

Though the Coleman Company conceded that it provided Polyama and Zhongshan with

*most* of the design specifications for the Monster Mania tube, it denied specifying the location of

the Monster Mania tube where the tow rope attachment should have been sewn onto the

tube—one of the elements of the tube's design that Mr. Frost cited as being defective.  In fact, *all*

of the Defendants deny designing the location of the Monster Mania's tow rope attachment.  Of

course, one of the Defendants must have designed the location of the tow rope attachment

because they were the only three actors involved in the production of the Monster Mania tube.

Credibility determinations are the province of the jury, and this court may not choose which

Defendant to disbelieve.  *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 254 (1986).  As such, a material dispute exists as to whether Polyama or Zhongshan played any role in designing the Monster Mania tube and whether they owed Williams a duty related to the tube's design. Therefore, Polyama and Zhongshan's motion for summary judgment on Williams' negligence claim is due to be denied.

## II.  Conclusion

For the reasons discussed above, this court **DENIES** the Coleman Company's motion for summary judgment, in which Polyama and Zhongshan joined.  (Docs. 85 & 88, respectively). The court also **DENIES** the Defendants' joint "Motion to Strike Plaintiff's Expert John C. Frost."  (Doc. 87).  Finally, the court **DENIES** Polyama and Zhongshan's "Motion for Summary Judgment Specific to Count II."  (Doc. 89).   **Done** and **ordered** this 6th day of July, 2015.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE